People of the State of Illinois, Plaintiff-Appellee, v. Sam Castanza, Defendant-Appellant.

Gen. No. 51,844.

First District, Third Division.

February 29, 1968.

Rehearing denied April 16, 1968.

Samuel V. P. Banks and Anna R. Lavin, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal from an order of revocation of probation. Defendant was originally granted probation on April 20, 1965, following his plea of guilty to a charge of violation of sections 8–2 and 11–19 of the Criminal Code (Ill Rev Stats 1963, c 38, §§ 8–2 and 11–19). Those sections prohibit conspiracy to solicit and pimping. The orders granting probation provided that defendant "shall

not, during the period of said probation, violate any criminal law of the State of Illinois or any ordinance of any municipality of said State. . . ."

On June 8 and June 16, 1966, Castanza's probation officer recommended to the trial court that a warrant issue for violation of probation because, on June 4, 1966, defendant had been arrested and charged with soliciting for prostitution and being a keeper of a house of ill fame. On June 16, 1966, the court issued rules to show cause why probation should not be terminated. On July 15, 1966, a hearing was held on the matter and the court, upon finding that there had been a violation of the terms of defendant's probation orders, revoked and terminated them and sentenced defendant to a term of one year in the county jail.

Defendant contends on appeal that (1) the evidence failed to prove any solicitation for prostitution or that defendant was a keeper of a house of ill fame; (2) evidence was improperly admitted, over defendant's objections, which related to activities of which defendant was given no notice nor opportunity to prepare against, thereby depriving him of due process, and (3) the decision was founded in part on conclusions of the court not fairly deducible from the evidence.

At the revocation hearing detective John McCormick testified that he entered a tavern called Vineyard A Go-Go on North Sheridan Road in Chicago about 10 p. m. on June 2, 1966. He was not in uniform. He sat down at the bar and began a conversation with the defendant by buying him a drink. McCormick said he was willing to pay money for a girl for purposes of prostitution, and defendant told him there was nothing there that night, but he should come back the following evening, a Friday. McCormick said that while he was in the tavern he observed defendant directing the bartender and the dancing girls in their duties.

He also stated that he observed numerous people come in, hand Castanza money, and leave. Castanza would then pocket the money and write some figures on pieces of paper.

McCormick returned to the tavern on June 3, 1966, about 11:30 p. m. He sat down at the bar and greeted Castanza who told Delana Rothchild to sit next to McCormick. After a conversation between the girl and the detective he told the defendant that he had offered her $40 to spend an hour with him in bed but that she refused and said she was sick. Castanza said, "Well, . . . she was sick." McCormick added that he was going to leave because there were no girls around, to which Castanza replied, "Stick around, wait awhile, somebody will be in."

Shortly after that conversation Diane Popek entered the tavern and took the seat next to McCormick, although there were other vacant seats at the bar. As she sat down Castanza grabbed the detective's arm and said, "Talk to that girl, . . . she'll take care of you." McCormick talked with the girl and then told Castanza that she said she could not go with him (McCormick) because she had a date in 45 minutes. Castanza replied, "I'll take care of things, I'll fix you up." He walked over to Popek and said, "Diane, this is a good friend of mine, I want you to take care of him. He will spend money with you."

Another conversation between McCormick and Popek occurred, McCormick told her to wait a second, he got up from his seat, went over to Castanza and said he was going to Popek's place and was going to pay her $20 to engage in sexual intercourse with him. He asked if that was too much. Castanza said, "No, do what you want, she'll tell you what she wants." The detective and the girl, who had been together for about 15 minutes, then left the tavern and went to her apartment.

McCormick related a conversation between him and Popek at the apartment concerning what he would get for his $20. The girl told him she would engage in sexual intercourse with him if he would wear a contraceptive. The girl undressed and got into bed and McCormick arrested her.

McCormick met his fellow officers, returned to the tavern, arrested defendant and searched the premises. Castanza cleared the cash register, ran a tape on the night's receipts and pocketed the money. He then took keys from his front pocket and locked the front door. The tavern owner registration was in the name of Thomas Gatto. Castanza listed his occupation with the probation officer as an employee of the place. McCormick testified that Castanza told him he owned the place. Money other than the cash register receipts was confiscated from defendant along with several slips of paper containing first names and initials and figures.

Police officer William Meade testified that he was at the Vineyard A Go-Go on June 2nd. He saw the defendant answering the phone numerous times and giving directions to two dancing girls and the bartender. He also saw at least two persons come in, hand currency to Castanza and leave.

A police officer assigned to the "juice section" of the intelligence division, John Williams, examined three slips of paper recovered from Castanza and testified that, based on his investigating experience, the slips were records of usurious loans.

Diane Popek testified that she is not a prostitute and had never been arrested prior to this time. She stated that defendant did not tell her to take McCormick to her apartment. She admitted that she always kept contraceptives in her apartment and that, upon taking McCormick there, she undressed and got into bed.

Delana Rothchild testified that Castanza never asked her to commit acts of prostitution nor directed her in her work at the tavern. She testified that she took directions in her work from the bartender and she worked only for tips. She said she knew Castanza from the tavern and that he was in there about three or four nights a week.

Officers Palmeri and McCormick testified in rebuttal that in the squad car on the way to the tavern to arrest the defendant, Popek said Castanza had previously sent her three "tricks" for purposes of prostitution.

Defendant first contends that the evidence failed to prove any solicitation for prostitution by him or that he was a keeper of a house of ill fame. Section 11–14 of the Criminal Code provides in part:

"(a) Any person who performs, offers or agrees to perform any of the following acts for money commits an act of prostitution:

"(1) Any act of sexual intercourse; or
"(2) Any act of deviate sexual conduct."

(Ill Rev Stats 1965, c 38, § 11–14.)

Section 11–15 provides in part:

"(a) Any person who performs any of the following acts commits soliciting for a prostitute:

"(1) Solicits another for the purpose of prostitution; or
"(2) Arranges or offers to arrange a meeting of persons for the purpose of prostitution; or
"(3) Directs another to a place knowing such direction is for the purpose of prostitution."

(Ill Rev Stats 1965, ch 38, § 11–15.)

The committee comments to this section state that it is not intended that it be necessary to show that actual acts of prostitution followed the solicitation and that financial benefit is not an element of the offense.

Section 11–17 provides in part:

> "(a) Any person who has or exercises control over the use of any place which could offer seclusion or shelter for the practice of prostitution who performs any of the following acts keeps a place of prostitution:
>
>> "(1) Knowingly grants or permits the use of such place for the purpose of prostitution; or
>>
>> "(2) Grants or permits the use of such place under circumstances from which he could reasonably know that the place is used or is to be used for purposes of prostitution; or
>>
>> "(3) Permits the continued use of a place after becoming aware of facts or circumstances from which he should reasonably know that the place is being used for purposes of prostitution."

(Ill Rev Stats 1965, ch 38, § 11–17.)

The committee comments point out that the crucial relation of an accused to the place is control of the premises. He may be the owner or lessor, a trespasser or an employee in the premises.

On June 4, 1966, defendant was charged with violating sections 11–15 and 11–17.

■ The parties do not agree as to what is the required quantum of proof in a hearing on revocation of

probation, but the courts have held that defendant's guilt need be proved by a preponderance of the evidence. People v. Headrick, 54 Ill App2d 44, 203 NE2d 157; People v. Price, 24 Ill App2d 364, 164 NE2d 528; People v. Dwyer, 57 Ill App2d 343, 206 NE2d 113. Furthermore, whether the proof had to be by clear and convincing evidence or by the mere preponderance of the evidence, the State, by its evidence, has satisfied both criteria.

In the instant case there was testimony by detective McCormick that he told the defendant he was looking for a girl for purposes of engaging in sexual intercourse for money; that is, prostitution. Defendant, knowing the tavern patron's wishes on June 2nd, told him there was nothing available that night but he should come back the following evening. When the detective returned on June 3rd the defendant sent Delana Rothchild over to talk with the detective at the bar. When she refused McCormick's proposition, Castanza said for him to wait around that someone would be in. Shortly thereafter Diane Popek arrived and sat down next to McCormick. Castanza came over to the detective and told him to talk to Popek and at the same time commented on her sexual capabilities. When the girl refused McCormick's suggestion, Castanza told her to take care of McCormick. Soon after that McCormick told Castanza that she had agreed to have sexual intercourse with him for $20. When asked if that was too much Castanza said, "No, do what you want, she'll tell you what she wants."

It is clear from the above facts that Castanza arranged a meeting of persons for the purpose of prostitution. It cannot be said that he did not know what McCormick had in mind or that he was just passively involved. Although he did not formally introduce the parties he directed McCormick to Popek and interceded on behalf of the detective when the girl displayed reluctance.

On the evidence it can also be said that Castanza was keeping a house of ill fame. It has been shown that

he knew arrangements were being made on the premises. Inasmuch as prostitution is committed by offering or agreeing to commit an act or acts of sexual intercourse or deviate sexual conduct for money, the acts within the tavern, as related by McCormick, showed the commission of prostitution. This is true although more details were worked out between Popek and McCormick at the girl's apartment.

■ Defendant argues that he was not in control of the premises in that Thomas Gatto was the registered owner, and the State offered no proof that Castanza was even employed there. However, there was testimony that he answered the phone, instructed the bartender and directed the dancing girls. McCormick testified that Castanza told him that he owned the place. After his arrest the defendant emptied the cash register, ran a tape of the night's receipts and pocketed the money. Upon leaving the premises, he took a key from his pocket and locked the front door. Castanza was registered with his probation officer as an employee of the Vineyard A Go-Go. Those circumstances are sufficient for the court to have found he was in control of the premises as that term is used in section 11–17 of the Criminal Code.

■ The conclusions of the court, that defendant had engaged in soliciting for prostitution and had kept a house of ill fame, were well founded on the evidence in the record.

Defendant next contends that evidence was improperly admitted, over his objections, which related to activities of which he was given no notice nor opportunity to prepare against, thereby depriving him of due process. The evidence complained of is that which allegedly pertained to Castanza's operation of a juice racket. The testimony showed that two officers observed people enter the Vineyard A Go-Go, hand money to the defendant and walk out. They did not appear to buy anything in the tavern. One officer testified that Castanza would then

write some figures on slips of paper. A third officer testified that, based on his investigation experience in the "juice section" of the intelligence division, he believed the slips of paper recovered from the defendant to be records of usurious loans. The defendant objected to that testimony as immaterial and the court said:

> "The Court: It has a lot of bearing with me. I'm the one who placed him on probation, I am having a hearing to see whether or not I should revoke his probation. . . .
>
> "The Court: The Court knows how these things operate, and the court knows that you couldn't get these people to come in and testify, that they would be terrified. I am admitting the sixteen hundred ninety-four dollars and also People's Exhibit 2 and also People's Exhibit 1, the list that was taken from his person.
>
> "It is connected up by two different police officers in the course of two nights, seeing different people coming into the place there and went over and handed him currency.
>
> "And when they put him under arrest and searched him, they found the cash, so he evidently took money out of the envelopes. They are admitted in evidence."

The defendant has cited cases which hold that a defendant at a hearing on revocation of probation is entitled to know in advance how he allegedly breached the probation order so as to be able to properly prepare his defense.

In People v. Dwyer, supra, the court held that the evidence did not sustain a finding that the defendant had violated his probation in the manner charged in the report of the probation officer. The court found that the evidence was even less convincing on the matters not charged in that report and added that the defendant was

not advised prior to the hearing that he was being charged with those infractions. However, the main reason for reversal was the failure of proof on the points mentioned in the report.

In People v. Headrick, supra, the court affirmed the revocation even though evidence had been admitted on matters not charged in the notice because the defendant admitted one violation (of which he was given notice) of his probation.

In People v. Enright, 332 Ill App 655, 75 NE2d 777, the court reversed the revocation of the defendant's probation because he was given no notice of any of the charges against him and the court would allow no evidence on behalf of the defendant, thereby giving him no hearing at all.

It is clear that in none of the above cases did the court reverse the judgment on the grounds of admission of evidence of violations other than those of which the defendant was given notice.

In People v. Tranowski, 20 Ill2d 11, 169 NE2d 347, the defendant was charged with armed robbery. The evidence on that charge proved him guilty beyond a reasonable doubt. Evidence of other robberies closely connected to the one charged in the indictment and evidence of a killing of one of the alleged victims was admitted. The court ruled that the evidence of other robberies was properly admitted as tending to establish a scheme or design. However, the court said that evidence of the killing (the eyewitness was unable to identify the defendant) was improperly admitted in that it in no way tended to prove the defendant's presence in the area or a scheme similar to the robbery charged in the indictment. Although the Supreme Court found that it was error for the trial court to have admitted that evidence, it continued and said on page 17:

> "However, it is not the duty of this court to review the record in a criminal case to determine whether

or not it is free from error. (People v. Sleezer, 9 Ill2d 57; People v. Davis, 406 Ill 215; People v. Cardinelli, 297 Ill 116.) It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error. (People v. Cavanaugh, 13 Ill2d 491; People v. Susanec, 398 Ill 507.) Where the competent evidence shows, beyond all reasonable doubt, that the defendant is guilty in a case where the jury are not the judge of the penalty to be inflicted upon the defendant, error will not ordinarily require reversal of the judgment of conviction. (People v. Guilfoyle, 321 Ill 93.) Where it is clear from the record that the jury could not have reasonably found the defendant not guilty, errors in the admission of evidence do not require reversal. People v. Burger, 259 Ill 284."

 At the close of all the evidence in the instant hearing the judge stated that he did not believe the testimony of the two girls who testified on behalf of Castanza. Defendant argues that the testimony of Delana Rothchild was uncontradicted and in no way impeached and, therefore, the court, as trier of fact, must believe her. It is the province of the trier of fact to weigh the evidence and determine the credibility of the witness. (People v. Ray, 80 Ill App2d 310, 225 NE2d 167; People v. Jennings, 84 Ill App2d 33, 226 NE2d 566.) This includes belief or disbelief of a witness' testimony as well as resolving conflicts in evidence. Furthermore, Rothchild's evidence as to Castanza's relationship to the Vineyard A Go-Go was contradicted by the testimony of two officers who stated that they saw him giving directions to the tavern employees.

 The judge added that he had listened carefully to the witnesses and observed their demeanor while testi-

fying. He stated that the testimony that McCormick and Popek met and in 15 minutes were up in her apartment and she was undressed was inconsistent with her testimony that she was not a prostitute. The court added that it was Castanza who arranged the meeting of the officer and the girl and made the prostitution possible. From those remarks of the court it is clear that he based his revocation order on the finding that Castanza was soliciting for prostitution and was keeping a house of ill fame. The judge, at the time of his final determination made no reference to the alleged evidence of a juice racket. He was not revoking Castanza's probation because of the alleged juice racket activity, and indeed the evidence of such activity was far from sufficient to justify any finding that he was carrying on a juice operation. The money he received could have been for any number of things. The slips of paper recovered from the defendant are not in the record in this court, and we cannot say that they were records of usurious loans. While we agree that the testimony should not have been admitted into evidence, it was not reversible error.

■ Defendant finally contends that the decision was founded in part on conclusions of the court not fairly deducible from the evidence. He complains of the admission of McCormick's testimony concerning a conversation between Popek and him at her apartment. The defendant objected to the testimony on grounds of immateriality and that it was "outside the presence of the defendant." The court in People v. Carpenter, 28 Ill2d 116, 120, 190 NE2d 738, said:

> "Seemingly, this type of objection, frequently appearing in the trial records before this court, arises from a misconception of the rules of evidence, and a belief that any statement or conversation occurring in the absence of defendant is inadmissible. Such is not the law.

"While we are not clear as to the origin of this notion, it apparently is connected in some way with the hearsay rule. . . . The fundamental purpose of the hearsay rule was and is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered. While the administration of an oath and the right of confrontation are also spoken of as necessary elements, the essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the act asserted. . . . If this requirement is met, . . . the presence or absence of the defendant is immaterial."

The conversation included no mention of Castanza, and both parties to the conversation were at the hearing and testified. That testimony did not violate the hearsay rule. What occurred at the apartment was merely a working out of the details of the prostitution agreement and was material to that transaction but, since we have held that the basic agreement was completed in the tavern, not essential. It was surplusage but not inadmissible merely because it occurred out of the presence of the defendant. Nor was it reversible error to have admitted it. It could not have harmed the defendant's position since it did not refer to him nor did it materially change the prostitution arrangement.

Defendant argues that the evidence was clear that Castanza did not introduce the detective and Popek. We do not agree. Although he did not formally introduce them he told the detective to talk to that specific girl because she would take care of him (meaning she would satisfy his wish for a girl for prostitution purposes).

Finally the defendant argues that the court came to an erroneous conclusion that Castanza told McCormick to

come back the second night for a girl and consequently on the second night Popek showed up. This is not, as defendant asserts, wholly irreconcilable with the testimony. On the contrary, the evidence clearly showed that Castanza told McCormick to return the second night because there would be girls or a girl there on Friday night. The second night, Friday, he sent one girl over to talk to McCormick and, when that attempt failed, he directed McCormick to Popek, with whom an agreement, to commit sexual intercourse of deviate sexual conduct for money, was reached.

The court reached the only conclusions possible from the evidence in this record.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.